## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

**DAVID JONES,**

                Plaintiff,

                                        CASE NO:

Vs

**MASTEC, INC.,**

                Defendants.

_____/

### COMPLAINT

COMES NOW, the Plaintiff, **DAWN E. COLBERT** (Plaintiff), by and through her undersigned

counsel, and files this first amended complaint against  **MASTEC, INC.** (Defendant), and

alleges:

1.      That the jurisdiction of this court arises under the Civil Rights Act of 1866, 42 U.S.C. §

1981 ("Equal Rights Under Law").

2.      That the Plaintiff is a resident of Dade County, Miami, Florida.

3.      That the Defendant is incorporated and (or) licensed to do business in the State of

Florida, with a principal office at 12400 S.W. 134 Court, Miami, Florida 33187.

4.      The Plaintiff filed a Charge of Discrimination alleging racial discrimination before the

Miami-Dade County Commission on Human Rights ("Commission").

5.      The Commission found reasonable cause to believe that the Defendant is not in

compliance with Title VII of the 1964 Civil Rights Act and (or) the Florida Civil Rights Act of

1992 (and comparable City of Miami Ordinance).  **Exhibit A**.

6.      The parties have attempted to a pre-suit mediation before Laura Bonn, Esq., ATD

Mediation, on April 25, 2012. However, the parties were unable to resolve the issues presented

herein.

7.      The Plaintiff has elected to pursue the within racial discrimination claim pursuant solely

to § 1981.  Since § 1981 does not require administrative exhaustion before the Commission or

the U.S. Equal Employment Opportunity Commission, the Plaintiff has not attached a "Notice of

Right to Sue" to this complaint.

## COUNT I
## STATEMENT OF FACTS

8.      The Plaintiff hereby incorporates and restates paragraphs 1 through 7

### A.  Employer

9.      MasTec is a a national infrastructure construction company serving the energy,

water/sewer/civil, communications, and government sectors.

       A.      It builds renewable-power options, power-delivery systems, cable, satellite-

television networks, fiber-optic highways, natural-gas systems, and data networks with one of

the world's largest fleets of bucket trucks, backhoes, trenchers, and heavy equipment.

       B.      At the time of Mr. Jones employment,  MasTech employed approximately 9,000

employees.

10.     During the time period in question, from approximately January 2008 through June 2008,

MasTech issued an employee handbook to its employees.

       A.      The handbook provided a guideline on the complaint reporting procedures related

to issues of harassment, discrimination, and unfair employment practices to the Human

Resources Specialist.

       B.      This handbook states that a "My Safe Workplace" is a 24-hour incident reporting

hotline.  This hotline is available to take complaints or reports 24 hours a day, 7 days a week.

This can be done online or by phone (800 number).

       C.      The handbook states that if employees feel that their concerns have not been

2

addressed by the various avenues provided they may directly call and file a complaint with the EEOC or the appropriate agencies.  The handbook also states that when an employee fails to contact his/her immediate supervisor for three consecutive work days they will be considered as having voluntarily resigned.

### B.  Employee

11.     Plaintiff is a 42-year old African American male.

12.     Mr. Jones was hired by MasTec, Inc. on January 15, 2008 to work as an Installation Technician.

 A.     He was hired in the Advanced Technologies Division.

 B.     His job duties included the installation, maintenance, and repair of satellite service for Direct TV subscribers.

 C.     Within months of his initial employment, Mr. Jones noticed that Mastec, Inc. operated a racially-discriminatory system of dispensing job-assignments to its installation technicians.

 D.     More specifically, he noticed that the African-American installation technicians received the least-desirable or worst job assignments.

 E.     In other words, MasTec supervisors would assign the better jobs to the white or Hispanic technicians.

 F.     The Installation Techs were paid "piece" work.  And the higher-paying "piece" work jobs, which paid more money, were routinely assigned to the white or Hispanic employees. Whereas the worst jobs—which were typically "up-grade jobs and "service" call jobs—were routinely assigned to the black or African American technicians.

13.     Mr. Jones frequently engaged in "protected activity" through lodging verbal complaints of racial discrimination with the Defendant's supervisors about these racially-discriminatory

practices.

       A.     For example, Mr. Jones complained that Mr. Chamorro, a Hispanic male,

routinely assigned the best, most lucrative work assignments to white/Hispanics technicians.

More specifically, Mr. Chamorro:

       (1).     Assigned Mr. Jones to work at S.W. 8th Street, in Miami, even though this was an

       area where the vast majority of the population only spoke Spanish and Mr. Jones does not

       speak Spanish—resulting in his inability to perform much of the needed work to potential

       customers in that area;

       (2).     And to Miami Beach, where Mr. Jones could not gain access to any of the high

       rise buildings because the City of Miami Beach's building ordinance does not allow it

       vendors to do so—resulting in a significantly lower number of work orders for Mr. Jones.

       B.     As a result, Mr. Jones lost work and income because of the fewer work orders.

On the other had, Mastec's Spanish-speaking employees, who often reported to work late, still

received quality, more-lucrative work orders, because Mastec's managers reserved these work

orders exclusively for them.

14.    Plaintiff repeatedly lodged complaints about these racially discriminatory job assignment

practices, referenced above in paragraph 13, to the following supervisors:

      A.       Yonkey Nunez, supervisor;

      B.       Alexandria Abreu, Employee Relations;

      C.       Carla Veils, Human Resources; and

      D.       To the "My Safe Workplace" hotline.

15.    Despite Plaintiff complaints, referenced above in paragraph 14, the Defendant took no

meaningful action.

16.    Plaintiff received no support from his immediate supervisors.

A.      On May 12, 2008, the Plaintiff used the company's "My Safe Workplace" hotline to report that on May 3, 2008, Neldo Dominguez, the site supervisor, did not assist him when he could not get a signal for an installation.

B.      In addition,  Plaintiff  complained that Mr. Dominguez usually would not answer his telephone when he needed his assistance to do his work.

C.      Plaintiff spoke to Helbert Villa, the Regional Director of Operations, and told him about the problems he was having with Neldo Dominguez.

D.      Helbert Villa told Mr. Jones to see him in his office so these problems could be straightened out.

E.      However, Mr. Villa never showed up to meet with Plaintiff. And so Mr. Jones spoke to Younky Nunez instead.  Plaintiff told Mr. Nunez that he did not want Neldo Dominguez to be his supervisor anymore in order to avoid future confrontations.

F.      Younky Nunez told Plaintiff that David Weitzman would be his supervisor. When Plaintiff approached David Weitzman, Mr. Weitzman said that neither himself or Neldo Dominguez would be the Plaintiff's supervisor.

17.     Mastec supervisors or superiors directed racial slurs at the Plaintiff.

A.      For example, on or about the second week of April 2008, Neldo Dominguez walked up to where the Plaintiff was standing and said, "Nigger, I am still your supervisor, whether you like it or not."

B.      Plaintiff's co-workers Mr. Alvarez and Mr. Phillips witnessed the incident. And we have a witness affidavit from Mr. Phillips substantiating this claim.

C.      On or about the first week of May 2008, as Plaintiff  was waiting for his work orders, Yonkey Nunez pulled him aside and told him that if he goes          back to the main office to make another complaint his "black ass would be out of there as soon as he comes in."

D.      Plaintiff reported these racial slurs to the Defendant's supervisors and senior managers.

18.     Soon after the Plaintiff the racial slurs referenced in paragraph 17, on or about May 13, 2008, someone mysteriously stole the Plaintiff's work tools.  However, Younky Nunez prohibited the Plaintiff from filing a police report.  The Plaintiff could not finish the remaining work orders for that day because of the missing tools; and he could not get a phone call through to the office to change the work orders.  Neither was the Plaintiff able to get any work on the following day, May 14, 2008.

19.     Soon after the Plaintiff's tools were stolen, Supervisor David Weizmann told the Plaintiff that the Defendant had received a damage claim against Mr. Jones.  Mr. Jones was informed that one of his former customers had lodged a complaint against him. Weizmann informed the Plaintiff of this customer complaint on May 16, 2008.

A.      Supervisor Younky Nunez  accused the Plaintiff of making 16 holes in the wall of a client's house.

B.      The customer has provided a statement that the Plaintiff was not the technician who cased the damage to her property.  Therefore, the Defendant's supervisors had no credible basis whatsoever for believing that the Plaintiff was the technician who had caused the damage which formed the underlying basis for the customer complaint.

20.     On or about May 23, 2008, the Plaintiff met with his supervisors to discuss the complaint.

A.      During the course of this discussion, MasTec granted permission to the Plaintiff to travel to the customer's home to refresh his memory, because Mr. Jones did not remember the work order.

B.      Furthermore, MasTec supervisors also informed Mr. Jones to not return to work until further notice, as he was under an investigation.

C.      Plaintiff left this meeting.  While on his way home, he drove past the home of the customer who had allegedly filed the complaint against him.

D.      When Plaintiff saw the home, he recalled that he and his co-worker, Jerome Green, had completed a work order at that home some time in February 2008.  Plaintiff remembered that when Jerome Green and he took down a Triple Set Dish, they noticed 16 holes in the wall, which another technician apparently had made. The Plaintiff remembered that he had proceeded to install the satellite dish on top of these existing holes.  He recalled that the client told him that another technician from the company had done work previously in her house.

E.      When the Plaintiff remembered what had occurred, he immediately telephoned his supervisor Younky Nunez to inform Mr. Nunez regarding what has occurred. However, Mr. Nunez did not respond to the Plaintiff's message or return the Plaintiff's call.

F.      Plaintiff eventually confronted Mr. Nunez, face-to-face, and informed Mr. Nunez about what had transpired regarding the 16 holes in the customer's wall. Plaintiff informed Mr. Nunez that Jerome Green and the customer could verify the facts. Mr. Nunez told the Plaintiff that he would look into the matter, "to check it out."  Mr. Nunez never again contacted the Plaintiff to inform him of whether he ever spoke to Mr. Green or to the customer.

21.     On or about May 23, 2008, Mr. Nunez told the Plaintiff that the Plaintiff could not work until the case was investigated.

A.      Plaintiff drove the company work-van home, and awaited a telephone call from the Defendant's supervisors, who would inform the Plaintiff on the status of the investigation and whether or not to return to work.

B.      Plaintiff, however, did not hear from anyone over the next 3-5 days. The Defendant later informed the Plaintiff that because he was a no-call, no-show for three consecutive days, that he was terminated. The Plaintiff disputed that he was a no-call, no-show,

because the Defendant's supervisor had told him to not report to work until after the investigation was completed.

C.      The Defendant removed the company van from the Plaintiff's private residence, without informing the Plaintiff.

D.      Therefore, the Plaintiff called the Defendant to report the van stolen. That is when the Plaintiff first learned that he had been terminated for no-call, no-show for three consecutive days.

E.      Supervisor David Weltzman telephoned the Plaintiff to make arraignments for the Plaintiff to come to the Defendant's premises in order to remove the Plaintiff's personal work tools and equipment.

F.      The Plaintiff informed Mr. Weltzman that he would go to the Defendant's premises, but did not give Mr. Weltzman an exact date and time.

G.      When the Plaintiff went to the Defendant's premises to remove his personal items out of the work-van, supervisors Fernando Lluberes, Yariel Matos, and David Weltzman approached the Plaintiff. All three witnessed Mr. Jones removing items from the company van.

H.      One of the supervisors asked the Plaintiff, "Why are you quitting?"  To which, the Plaintiff responded, "I'm not quitting, Yonkey fired me."

### COUNT I:   DISPARATE TREATMENT: RACE
### ("Retaliatory Termination—Section 1981" )

22.     The Plaintiff hereby re-states and re-alleges paragraphs 1 through 21.

23.     The Plaintiff is an African-American and therefore he is a member of a protected class.

24.     From between January 15, 2008 and May 28, 2008, the Plaintiff engaged in a series of oppositional activities which effectively lodged protests against racial discrimination with respect to discriminatory job assignments, having been referred to as "black ass" and "nigger,"

having had his work tools mysteriously stolen, and having been subjected to what the Plaintiff perceived as a factually-baseless investigation. The Plaintiff lodged these complaints through his supervisor chain of command, to Employee Relations, to Human Resources, and to the MasTec, Inc. "Hotline."

25.      The Defendant terminated the Plaintiff's employment on or about May 29, 2008, allegedly because the Plaintiff was a "no-call, no-show." The Defendant's reasons for terminating the Plaintiff lack good faith and plausibility.

26.      There is a causal connection between the Plaintiff's protected activities and the Defendant's termination, in that there is a very close temporal proximity between the oppositional conduct (the "Plaintiff's complaints") and the adverse employment action ("termination").

27.      WHEREFORE, the Plaintiff demands:

      A.      Trial by jury.

      B.      Judgment against the Defendants for compensatory and punitive damages.

      C.      Affirmative Action, as deemed appropriate by the Court.

      D.      Reinstatement and Injunctive Relief, as deemed appropriate by the Court.

      E.      Attorney's fees and costs.

## COUNT II:   DISPARATE TREATMENT: RACE
### ("Hostile Work Environment—Retaliatory Harassment")

28.      The Plaintiff hereby re-states and re-alleges paragraphs 1 through 21.

29.      The Plaintiff is an African-American and therefore he is a member of a protected class.

30.      From between January 15, 2008 and May 28, 2008, the Plaintiff engaged in a series of oppositional activities which effectively lodged protests against racial discrimination with respect to discriminatory job assignments. The Plaintiff lodged these complaints through his supervisor chain of command, to Employee Relations, to Human Resources, and to the MasTec,

Inc. "Hotline."

31.     The Plaintiff was subjected to a common law tort of "slander"[1] when the Defendant's supervisor called him a "nigger," as referenced above in paragraph 17.[2]

32.     The word "nigger," when uttered in its historical context, constitutes the common law tort of slander.[3]   In this case, on or about the second week of April 2008, Neldo Dominguez walked up to where the Plaintiff was standing and said, "Nigger, I am still your supervisor, whether you like it or not."

33.     Supervisor Dominguez's usage of "nigger" was without question racially-degrading and mean-spirited manner, and thus in this case "nigger" was uttered in its traditional, historical, and slanderous context.

34.     Supervisor Dominquez's usage of "nigger" impaired a critical term, condition and privilege of the Plaintiff's employment, in that it affected the Plaintiff's emotional tranquility while at work.

35.     Supervisor Domingquez's usage of "nigger" was sufficiently severe and pervasasive so as to significantly alter the Plaintiff's terms, condition, and privileges of employment, in that it significantly impaired the Plaintiff's emotional tranquility while at work.

36.     The Defendant knew about Supervisor Dominquez's racial slur "nigger" but took no action.   Supervisor Dominguez subsequently terminated the Plaintiff within close temporal proximity to his having uttered the racial slur "nigger."

[1] Restatement (Second), Torts § 559, defines defamation as "[a]  communication [which]…tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." The Comment to § 559 states that "[c]ommunications are often defamatory because they tend to expose another to hatred, ridicule or contempt. A defamatory communication may tend to disparage another by reflecting unfavorably upon his personal morality or integrity…."
[2]   Race-based torts are cognizable under Section 1981.
[3]   See Footnote 1. The word "Nigger" can easily impair a black American worker's right to the "equal enjoyment" of an employment contract.  (A "nigger," in its historic context, was always something that no African American wanted to be in the South, particularly during the antebellum era or during the pre-civil rights era.) The reason is that "nigger" constitutes wholesale racial defamation (both libel and slander), because it attributes very degrading personal and racial characteristics to African Americans. Historically, when "nigger" was applied to black women, it meant, inter alia, that they were lascivious, ignorant, loud, musical, happy-go-lucky, lovers of watermelon, obnoxious, sexually illicit, and lazy; and when "nigger" was applied to black men, it meant, inter alia, that they were criminal-prone, ignorant, unusually lustful towards white women (i.e., rapists), thieves, lovers of watermelon, musical, loud, lazy, happy-go-lucky, etc.  Hence, this *wholesale racial defamation* both signified and justified racial segregation, lynching, and whites' disassociation with, and aversion to, African Americans. See, generally, Ralph Ginsburg, *One Hundred Years of Lynchings* (Baltimore, MD: Black Classic Books, 1988), pp. 9-252.  "Nigger," without question, when used in its historic context, constitutes wholesale racial defamation.   To be sure, the modern era of comedic entertainment and popular music has defaced the potency of "nigger" in our society.  Indeed, "[g]iven the protean character of *nigger*, which may signal several different (even contradictory) meanings, it is probably erroneous to conclude that the word itself necessarily furnishes proof of racial discrimination, even when the speaker is white and the target black." Randall Kennedy, *Nigger: The Strange Career of a Troublesome Word*, (New York: Vintage Books, 2002), p. 75.

37.     WHEREFORE, the Plaintiff demands:

A.      Trial by jury.

B.      Judgment against the Defendants for compensatory and punitive damages.

C.      Affirmative Action, as deemed appropriate by the Court.

D.      Reinstatement and Injunctive Relief, as deemed appropriate by the Court.

E.      Attorney's fees and costs.

F.      For whatever additional relief as is deemed just and appropriate by this honorable

Court.


                                    RESPECTFULLY SUBMITTED:

                                    __/S/ Roderick O. Ford__ ____
                                    Roderick O. Ford
                                    FBN: 0072620
                                    RODERICK O FORD LLC
                                    220 E. Madison Street
                                    Suite 1110
                                    Tampa, Florida 33602
                                    (813) 223-1200/(813) 223-4226 facsimile
                                    laboradvocate@fordlawfirm.org

MIAMI- DADE COUNTY COMMISSION ON HUMAN RIGHTS

## Amended Investigative Report

RE: EEOC Charge No.   510-2008-03820
    CHR Charge No.  08-0620-183

**Charging Party**                    **Respondent**

David Jones                           MasTec, Inc.
12450 S.W. 185 Street                 8850 NW 122nd Street
Miami, Fl. 33177                      Hialeah Gardens, Fl. 33018

## Statement of Determination

In accordance with Title VII of the Civil Rights Act of 1964, as amended, ("Title VII") and Chapter 11A, of the Miami-Dade County Code, as amended, ("Chapter 11A") it is determined that there is probable cause on the basis of retaliation to believe that an unlawful employment practice has occurred. Detailed below are the investigative findings, which led to this determination:

1. Mr. David Jones ("charging party") alleged that during his tenure with the respondent he was subjected to what he considered unfair and conditions of employment, and that he was subsequently discharged on or about May 29, 2008 on the basis of his race and national origin, Black/American.

2. The charging party is a person claiming to be aggrieved under Title VII and Chapter 11A. He filed the charge with the United States Equal Employment Opportunity Commission ("EEOC") on June 5, 2008. The charge was deferred and accepted for processing by the Miami-Dade County Commission on Human Rights (CHR), formerly the Miami-Dade County Equal Opportunity Board (MDCEOB), on June 20, 2008, within 180 days from the date of the alleged discrimination.

3. On September 30, 2008, a determination of a no cause was issued on this case. The charging party appealed the Director's decision, and based on a review of additional information the case was reopened on March 30, 2009. The authority for this action is cited in section 11A-28 (7)(c) of the code of Miami –Dade County, as amended.

4. MasTec, Inc. ("respondent") is a corporation doing business in Miami- Dade County engaged in the building, installation and maintenance of networks for communication, cable, satellite, and electrical utility companies. The respondent employed approximately 9,000 persons during the relevant period, and is an employer within the meaning of Title VII and Chapter 11A.

## Respondent's Response

4. The respondent denied the claim of race and national discrimination and retaliation. They
   contended that the charging party's employment was terminated for failing to notify his
   supervisor of three consecutive absences.

## Charging Party's Rebuttal

5. The charging party claims the respondent's defense (s) is pretext to discriminate against him.
   In his discrimination charge on June 5, 2008, the charging party asserts that he was given
   undesirable jobs and that the better jobs that made more money were assigned to white
   persons of Hispanic origin; that he complained to Human Resources and shortly thereafter
   was sent home because of a customer complaint; that on May 29, 2008 the company van
   was removed by the respondent from the front of his house and the following day he was
   informed his employment was terminated. For these reasons the charging party maintains
   that his race and national origin were the factors in the alleged adverse employment actions.

## Summary of Findings

6. The charging party was hired by the respondent on January 15, 2008 to work as an
   installation technician, in the Advanced Technologies Division. The charging party was
   responsible for the installation, maintenance, and repair of satellite service for Direct TV's
   subscribers.

7. In the company's position statement received August 4, 2008 the respondent's
   Representative submits in part, that on May 12, 2008 a customer made a damage complaint
   regarding a work order assigned to the charging party. On or about May 23, 2008, the
   charging party met with his supervisors to discuss the damage complaint. The respondent
   states that the charging party was not suspended or subjected to any disciplinary action as a
   result of the meeting.

8. The respondent further offers that the charging party was granted permission to travel to the
   customer's home to refresh his memory as he had indicated he did not remember the work
   order. According to the respondent, the charging party did not contact his supervisors after
   he left and did not return to work for three consecutive days. The respondent considered
   the charging party to have voluntarily resigned his job, as a result, the company vehicle
   assigned to the charging party was recovered from his home on or about May 29, 2008.

9. The respondent adds that on June 4, 2008, supervisors Fernando Lluberes, Yariel Matos,
   and David Weitzman witnessed the charging party removing items from the company
   vehicle that was recovered from his house. They approached the charging party and asked
   him why was he removing the items from the vehicle and the charging party stated that he
   was quitting because he refused to be held accountable for damages that he did not believe
   he was responsible for. The records contain non-notarized statements from the cited
   supervisors. According to Weitzman's statement, he also asked charging party "why didn't
   you call me to pick-up your tools, as we agreed the day before."

10. During his rebuttal conference with staff on August 18, 2008, the charging party testified in
    part, that he was the only Black technician. He believes that his employment was
    terminated in retaliation for having file complaints through the company's service line and to
    the Human Resources Department, against some of the respondent's supervisors. He

claims that Alexandra Abreu, the employee relations specialist, and Carla Veils from Human Resources had assured him that he would not be harassed or retaliated against for doing so.

11.  Charging party further stated that he reported to Younky Nunez, the Kendall Office Manager, that he was assigned to work at S.W. 8th Street, in spite of the fact that he does not speak Spanish and to Miami Beach, where he could not gain access to any high rise buildings because the City's ordinance did not allow it. As a result, he lost work and income because of fewer work orders. Charging party claims that he got to work early to "line-up" to be able to get work orders, however, Spanish employees who came late still received work orders, because managers reserved orders for them.    In spite of his complaint nothing was done about this.

12.  Charging party also offers that on May 12, 2008, he used the company's website "My safe workplace" to report that on May 3, 2008, Neldo Dominguez, the site Supervisor, did not assist him when he could not get a signal for an installation, or that Dominguez, usually would not answer his phone when he needed his assistance to do his work. He also claims that Chamorro, first name unknown, Hispanic, provided work orders in a selective manner, and was supplying choice jobs to White/Hispanic co-workers. Chamorro did not object when Joaquin, Cuban, did not want to do a particular job and then assigned the extra work load to another employee. Charging party contends that prior to his report to the company's website he spoke to Helbert Villa, Regional Director of Operations and told him about the problems he was having with Dominguez, and Villa told him to see him in his office "so we could straighten these problems out" but Villa did not show-up, so he spoke with Nunez instead. They discussed the problems he was having with Dominguez, and charging party told Nunez "I do not want to work the same shift as Dominguez, to avoid any confrontation". Nunez told him that David Weitzman would be his supervisor now. When he approached Weitzman, he informed charging party that neither Dominguez, nor himself was his supervisor.

13.  The record contains a transcript of charging party's claim report on May 12, 2008 to the company's website. The transcript shows that charging party also reported that "Since I made the complaint of not getting any work, I am now getting more work assigned to me."

14.  According to charging party, on May 15, 2008 David Weizmann told him that the company received a damage claim against charging party. Nunez accused him of making 16 holes in the wall of a client's house. Charging party believes that Nunez knows the technician that did the damage, and he was covering-up for him.

15.  The charging party recalled that after he heard the client's complaint, he drove to the client's house to verify that he had done the work assignment there, three months previously. However, he did not cause any damages. Charging party offers that when he and his co-worker, friend Jerome Green, who helped him with this work, took down a Triple Set Dish, it uncovered the holes. Then they proceeded to install the High Differential unit, and they installed the satellite dish on top of the existing holes. The client told charging party that another technician from the company had done work previously in her house.

16.  Charging party contends that on the same day, May 15, 2008, he called Nunez to report the situation but he did not respond. Then he drove back to the office and saw Nunez outside, talking to another technician. Charging party called him from his truck twice, and

he saw him forwarding his calls to voice mail. He then confronted Nunez and reported to
him what had happened. Charging party asked Nunez to talk to Green to verify that he did
not do the damages and to ask Ricky last name unknown, to check the old computer
system to locate the technician who did the damages. Nunez told him that he would do it,
but he never did. According to the charging party, at that point, Nunez  told him that he
could not work until the case was investigated, and that the client said the she would get
back to him at 2:00 pm. When he did not receive a call from Mr. Nunez, he called him on
the same date (May 15, 2008) at 3:30pm, but he said that he was still waiting to hear from
the client and that he would call him, but he never did. Two days later, charging party
called both Nunez and Weitzman, but they never responded.

17. On May 30, 2008 charging party reported that on May 13, 2008 someone stole his tools
from the company's van that was assigned to him, and Younky Nunez, Manager of
Operations from the Kendall area, prohibited him from making a police report. He could
not finish the remaining work orders for that day because of the missing tools and he could
not get through to the office to change the work orders. Consequently, on May 14, 2008,
he could not get any work.

18. The charging party denied that he resigned from his position and contends that neither
Nunez nor Weitzman, called him to work. The charging party offers that on May 29, 2008,
when he noticed that the van that was assigned to him was removed from in front of his
house, he called Nunez to report that the van was missing. Nunez told him that Weitzman
had picked it up and that charging party was fired. Four days (4) days later, Mr. Weitzman,
called charging party, to tell him to pick up his tools from the van. While charging party
was in the process of doing so, Weitzman came over and asked him if he was quitting.
Charging party answered that Mr. Nunez had discharged him.

19. During his rebuttal interview, charging party named and provided the contact information
of his witnesses: he stated that Leslie Phillips would confirm that he was assigned less
desirable work, Javier Alvarez can attest that he witnessed when Chamorro (first name
unknown) assigned better jobs to White Hispanics, who were friends of the supervisor,
and when Joaquin, Cuban, told Chamorro that he did not want to do an assigned job,
Jerome Green would testify that he helped charging party to do the job for the client who
filed the complaint and Ricky (last name (unknown) would testify that respondent could
check the old computer system to locate the technician who did the damages

20. The record further shows that at that time of the appeal the charging party on October 12,
2008, brought up additional issues related to discriminatory remarks that had been
allegedly made by his superiors, Dominguez and Nunez, on two different occasions based
on his race (Black).

21. According to the charging party, on or about the first week of May, 2008, as he was
waiting for his orders, Nunez pulled him aside and told him "If you go back to the main
office to make another complaint your black ase would be out of here as soon as I come
in." Charging party further alleged that on or about the second week of April 2008,
Dominguez walked up to where he was standing and told him, "Nigger, I am still your
supervisor, whether you like it or not." He said that Alvarez and Phillips witnessed the
incident.

22.----The record contains charging party's affidavit dated June 21, 2010, which memorialize in
part, journal entries of alleged incidents of disparate treatment by his supervisors from
February 24, 2008 until his alleged termination on May 23, 2008.

Various witnesses were interviewed in connection with this investigation. A summary of
each interview is included below:

### Leslie Phillips

Staff interviewed Mr. Phillips, Black/American on October 5, 2009 by telephone. This
interview was memorialized in his notarized affidavit. In his interview Philips states that he
had worked for the respondent for 3 years as a Technician. He had known charging party
for 6 months.  Since then, he had relocated to Atlanta, where continued working for the
company in the same capacity. His supervisors were Neldo Dominguez and David
Weitzman, both Hispanic who are the ones that assign the orders to employees. Phillips
disclosed that all employees received miscellaneous orders but his supervisors reserved
orders for their friends, mostly Hispanic, claiming that they could not stand in-line    to
receive their orders, because they were working in the field," while the rest of us needed to
line-up to get our orders". On a few occasions he was assigned to work in the Miami
Beach area, he could not access the job locations, because the City's ordinance did not
allow it. He was assigned to work in Spanish speaking areas, such as at 8th street and
homestead, and as he did not speak Spanish, he had communication problems. However,
he explains that Hispanics were also assigned to work in English speaking areas, and they
had commented to him that they had communications problems as well. He explained that
Hispanic employees such as Jemo told him that they had complained to supervisors about
not making enough money, because they were assigned to do just up-grading jobs.

Phillips offered that there were about 60 employees working at the Kendall location where
he used to work, including 3 or 4 supervisors. Of those just 10 employees were black. He
named; Everton, O'Neal, Sam, Jerome, Harold, Jones, and 2 Haitian employees, and
himself.

Phillips explained that as far as he remembered, Mr. Dominguez treated all employees the
same, including Hispanic or Black employees. With regards to charging party's allegations,
he said that everybody knew about his problem. He stated that on about April 14, 2008, he
heard Mr. Dominguez telling charging party "No matter, if you go to headquarters, Nigger, I
am still your supervisor." He remembered the morning he was ready to leave for work,
charging party came to the office upset. "He said that his work tools and the company's
van that he had been assigned to work with, had been removed from his house's
driveway. He said that he was "going to talk with the supervisors about this "He states that
he does not know whether charging party had resigned or has been discharged, nor does
he know if anyone else has filed a discrimination complaint against the company, or any
other supervisor.

### Javier Alvarez

Staff interviewed Javier Alvarez, on October 10, 2009 by telephone. This interview was
memorialized in his notarized affidavit. In his interview Alvarez stated that he is a White
Hispanic, and that he had worked for the respondent from approximately February to June
2008 as an installation technician. He stated that one morning, about April or May 2008,
as he was standing behind charging party waiting to receive their daily route assignment,

he observed charging party visibly upset and he heard him complaining about what he believed to be another unfair route assignment given to him by his supervisor. He stated, " I then heard the supervisor, White Hispanic, refer to David—in Spanish , as a "negro" in a derogatory manner to another White Hispanic installation technician, and continued to comment—in Spanish that David was a "trouble maker." When David asked me what the superior said, I informed him that he (the supervisor) had referred to him as a "Niger" in Spanish. The supervisor who allegedly made this comment was not identified by Mr. Alvarez.

## Gerome Green

Staff interviewed Jerome Green, on October 2, 2009 by telephone. He declined to sign an affidavit memorializing the interview. Mr. Green stated that he has worked for the company since 2004 as a technician, and he still works for them. He offered that he worked with charging party for a couple months and that the company received a complaint from a white female in her late 20's or early 30's regarding the installation of a satellite dish in her house. Green offered that he helped charging party with this job because he is a friend. He states that they did not drill the 16 holes in her house's wall. The holes were drilled by a technician, who had previously installed the triple dish set in her house. "When Jones and I took down the dish, the exiting holes were exposed". The only thing they did was to mount the high-definition unit, according to the company's guidelines. He stated that before starting the job, we told the customer what we would do. He showed her onto what it would be placed, and what we going to do to mount the dish and she agreed. We did the installation and got the system running.

Green stated that supervisors assign work orders to employees. He worked in Miami Beach for a year and on 8th street all the time. Sometimes there were complications because this was a heavily Hispanic populated area, and he does not speak Spanish. He was paid per job. Green stated that Black technicians in the office he works are 20 out of 60 employees. Green stated that "Mr. Jones told me something's about some employees' receiving different treatment; I have never had problems myself. Mr. Jones voiced his concern to me about being discriminated against, about 10 times. There is favoritism towards Hispanics in job assignments."

Staff's efforts to contact Ricky (last name unknown) were unsuccessful.

Staff interviewed Hilbert Villa, Regional Director of Operations; Neldo Dominguez, Younky Nunez, and David Weitzman.

## Helbert Villa

During the interview with staff Helbert Villa, White Hispanic, on June 15, 2010, Villa stated in part that he has worked for 9 years as Regional Director of Operations. He explained that he runs 3 of the company's different facilities, Kendall, Hialeah, and Ft. Lauderdale. Each facility has a site manager, Technicians' Supervisor who reports to the facility's manager. Each facility manager has 10 technicians assigned to him. Villa contended that orders are distributed equally and they never received any complaints about favoritism. However, he stated that if an emergency order came in and a technician is available in a particular area, he would be assigned the order. If they receive a complaint from a customer, the supervisor talks with the technician who worked on it, and an investigation is conducted immediately, but at the company's headquarters is where it is decided whether

The work orders could be re-assigned to the same person that is working in the same area. He denied receiving any complaints from employees, stating that orders were not being equally distributed. Orders are distributed on a rotating basis. The company had at least 60 installers of different nationalities, Cubans, Puerto Ricans, etc. in the Kendall location, where charging party worked. Weitzman contends that he had never heard of anybody being accused of making any derogatory remarks, to anybody in the company, including Dominguez or Nunez, towards charging party on the basis of his race, and national origin.

23. The respondent provided transcripts of the calls that charging party made on May 12, 2008, June 4, 2008 and June 10, 2010 to the company's website "my safe workplace." The record shows that, that after his discharge, charging party called on May 30, 2008 to report incidents of alleged discrimination based on his race and national origin. On June 4 and June 12, 2008, he called back to follow-up about his job termination and each time he maintained that he never resigned his position, but rather he was terminated.

24. The respondent stated that he was a no-show, no-call for 3 consecutive days. However, charging party maintains that Nunez has told him that could not work until the case was investigated, and that he would call him, but he never did. He contends that when he woke up on May 29, 2008 the van was gone. When he called Weitzman to let him know that the van was gone, he did not answer. The charging party called Mr. Nunez and he told him that someone had stolen the van from his house. He was never called back to work.

25. Charging party provided a CD which he obtained legally from the unemployment office related to the hearing on December 23, 2009 regarding his claim for unemployment benefits (docked with No. 2009-4034). During the replay if this CD, unemployment's officer asked Weitzman "When was the claimant hired to work for this company... If you know the day he was hired? Mr. Weitzman appears to be answering "...he was fired on January 15, 2008. Then he said "..he quit his job. He actually abandoned his position; his last work day was May. 21, 2008. The record shows that charging party was awarded unemployment benefits.

26. The record also shows that during his orientation, on January 15, 2008, the charging party signed the company's employee handbook.

27. Section VII foot note of this handbook provides a guideline on the complaint reporting procedures related to issues of harassment, discrimination, or unfair treatment on the job, to the company's Human Resources Specialist. This policy also states that a "My safe workplace is a 24 hours incident reporting hotline "to make a report , log on to www.mysafeworkplace.com or a Phone Hotline, "800 number." This hotline is available to take reports or complaints 24 hours a day, 7 days a week. Finally, employees that feel that their concerns have not been addressed by the various avenues provided above May directly call and file a complaint the EEOC or the appropriate agencies.

28. Section VI of the employee handbook related to attendance, punctuality and dependably." This section states that the company depends upon its employees; as such, you are expected to be at work on all scheduled worked days, and essential at all times. An employee who fails to contact his/her immediate supervisor for 3 consecutive work days will be considered as having voluntarily resigned.

to honor the complaint or not. They always try to accommodate employee's needs when possible. They join the line; they return forms from the prior day's jobs, and pick up new orders from the one window. Sometimes they cannot pick-up orders because they are in the field, or they work until late the previous day, and they are late to pick-up orders. Finally, he stated that he was not aware of any racial complaints made in the office by anybody, or by the charging party, against Nunez or Dominguez or anybody else.

### Neldo Dominguez

During his interview with staff Neldo Dominguez, stated in part that he worked for 4 years as a site supervisor. In response to charging party's allegations that supervisors never answer the phone when technicians need assistance. He contended that supervisor have to answer requests from customer and 15 technicians, that also need assistance. He stated that if once in while he happened to be on the phone when a call comes in, he forwards the call to voice mail, and then the first available supervisor will answer the call. Dominguez denied that Hispanic employees refused to do work orders; and that the undesirable orders were assigned to charging party. Finally, Dominguez denied vehemently that he made derogatory remarks directed to anybody's race. He specifically denied have being told charging party "No matter, if you go to headquarters, Nigger, I am still your supervisor.", he states that he had never made any derogatory remarks directed to anybody race, or that Nunez had been accused of making a derogatory comments, against anybody, or was aware of any of the claims by charging party about derogatory comments being made to him.

### Younky Nunez

In response to charging party's claim that he had precluded him from making a police report, when someone had broken into in his van, and stolen his tools, Nunez stated that if that had happened he never told him not to call the police. To the contrary, each time this happens in the field, employees are required to call the police and/or to bring in the report to the office. Nunez said that he sent Weitzman to pick up the van form charging party's home because he did not call, or show-up to work. He said he never sent out 2 (two) technicians to do the same job.

Additionally, Nunez stated if technicians need assistance, their calls are responded to by the lead technician that is nearest in the area. If they're talking with someone when they receive a call; they forward the in-coming calls to voice mail and the next supervisor, site manager, or director of operations that is available at the time, responds to the calls. Nunez informed that orders are equally assigned to technician within same area and regularly they receive 4 orders each. Finally, he denied that he had pulled charging party from the line where he was waiting for his orders, and made any derogatory comments to charging party. When they receive a claim from customers they start an investigation immediately.

### David Weitzman

During his interview with staff, David Weitzman, stated that he has worked since 2006 as a field technician, supervisor. Part of his job responsibilities is to comply with customer services, going to check services with technicians and dedicated 20% of his time to working with them. Supervisors do not assign the orders, the Direct TV system", SIEBEO" produces the orders, automatically generated orders are assigned by areas of work.

## CONCLUSIONS

In a case of employment discrimination on the basis of race and national origin, Black/American, male, alleging disparate treatment, the following needs to be shown:

1. That the charging party belongs to a protected group, under Title VII and Chapter 11A;
2. That the charging party was being subjected to harassment solely based on his race and national origin.
3. That the employer treated similarly situated employees, outside of his class more favorable,
4. That this harassment affected a term, condition or privilege of employment.
5. Respondent does not have a legitimate, non-discriminatory reason for the alleged adverse action, and
6. The reason offered by respondent is a pretext, or discriminatory reason, or not supported by the record.

The record has established that the charging party is a member of a protected category under Title VII and Chapter 11A. However the remaining conditions of the prima facie have not been met.

The charging party contends that during the course of his employment, he was subjected to various instances of disparate treatment by his supervisors, Neldo Dominguez and Younky Nunez, White Hispanic and that work orders were assigned in a selective manner by Chamorro to favor White Hispanic employees. Charging party claims that his supervisors ignored his telephone calls when he needed their assistance to do his work, that he was given undesirable jobs and the better paid jobs were assigned to White persons of Hispanic origin; that he was assigned to work in Hispanic communities even though he does not speak Spanish and to the Miami Beach area, where he could not gain access to the high rise buildings, because the City's ordinance did not allow this. The charging party further alleges that despite his various reports about this discriminatory treatment, the respondent did nothing to address his concerns.

The respondent denies charging party's allegations and contends that if technicians need assistance, their calls are responded to by the lead technician that is nearest in the area. If when they're talking with someone when they receive a call; they forward the in-coming calls to voice mail and the next supervisor, site manager, or director of operations that is available at the time, responds to the calls. The respondent maintains that orders are distributed equally and denied receiving any complaints from employees regarding favoritism or unequal distribution of work. They contend that supervisors only become involved in the "reassignment of work orders" and that they usually assign these orders to technicians that are currently working in that particular area.

In similar cases the courts rule that "in resolving disputed facts, witness testimonials of the parties, it is important to assess the totality of the record." The evidence on record shows that the charging party's allegations were only partially corroborated by his witnesses. Both of his witnesses, Leslie Phillips and Jerome Green, Black/Americans, confirmed that work orders were assigned by supervisors and that they were also assigned to work in the Miami Beach area and 8th street, and that there was favoritism towards Hispanics in job assignments. However, Mr. Phillips asserted that Neldo Dominguez treated all the employees the same and Mr. Green said that he

has never had problems with Dominguez. Furthermore, Mr. Phillips disclosed that Hispanic employees also had communication problems when they were assigned to non-English speaking communities, and Hispanic employees, such as Jemo, told him that Hispanic technicians had also complained to supervisors about not making enough money because they are assigned to do less desirable up-grading jobs.

Therefore, considering the totality of the circumstances in this case, it is reasonable to conclude that there is insufficient evidence to establish that the charging party has been subjected to disparate treatment on the basis of race and national origin. The charging party has failed to provide sufficient evidence to prove that similarly situated employees were treated more favorably as a result of their membership in a protected class. Furthermore, respondent has provided a legitimate, non-discriminatory reason related to order distribution; work assignments, work assignment areas and ways supervisors handle calls from technicians. There is a lack of evidence to suggest that the reason offered by the respondent for the alleged adverse action is a pretext for unlawful discrimination. Therefore, it is recommended that this part of the case be dismissed.

In a case of an employee alleging a hostile work environment on the bases of race, color and national origin, the following needs to be shown:

1. That the employee has been subjected to unwelcome harassing conduct.
2. That the harassment must have been based on the race and/or national origin of the employee;
3. That the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment;
4. That the respondent knew or having known of this harassment and failed to take prompt remedial action; and
5. That the employer is responsible for such environment under the theory of direct liability.

The charging party filed the instant discrimination charge on the basis of national origin and retaliation. On October 12, 2008, charging party appealed to the Director's decision of no cause and brought up additional issues related to discriminatory comments on the basis of his race and color (Black) allegedly made by his supervisors, Neldo Dominguez and Younky Nunez. The Miami-Dade County Commission on Human Rights has always been and continues to be vigilant, that the local, state and antidiscrimination laws are followed by employers and do not condone and/or tolerate any violation of therein. Therefore, the charging party's additional allegations of discrimination, on the basis of race and color (Black) were fully investigated.

In similar cases, the court held that whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

In Spriggs v. Diamond Auto Glass; 242 F.3d 179 (4th Cir. 2001), the court explained

Far more than a "mere offensive utterance," the word "n*gger" is pure anathema to African-Americans. "Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'n*gger' by a supervisor in the presence of his subordinates." Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 675 (7th Cir. 1993) (citation and internal quotation marks omitted).

Generally, a single isolated incident of harassing behavior will not constitute unlawful harassment; however, an unusually severe incident of harassment may be sufficient to establish such a claim. If racially discriminatory statements were made, their importance will depend on their egregiousness, overly significant. The charging party claims that Nunez told him on one occasion, "If you go back to the main office to make another complaint your black ass would be out of here just as fast you came in. In another occasion, Dominguez told him "Nigger, I'm still your supervisor if you like it or not." The charging party claims that these comments were made in front of his counterparts, Javier Alvarez and Leslie Phillips.

Alvarez, White/Hispanic, who speaks Spanish and English fluently testified that, "I heard a White supervisor, refer to David—In Spanish, as a "Negro" in a derogatory manner to another White Spanish, Installation technician, and continued to say – in Spanish that David was a trouble-maker. Alvarez stated that when David asked me what the supervisor had said, I informed him that the (supervisor) referred to him as a "Nigger "in Spanish. Mr. Alvarez did not identify the supervisor by name.

Phillips, Black/American a non- Spanish speaker testified that he heard Neldo Dominguez saying, "No matter if you go to headquarters, Nigger I am still your supervisor".

In this case, although only two isolated comments were made, the usage of such a blatantly discriminatory word was an intentional pejorative and increased the level of discrimination, based on its intended hurtfulness and humiliation. In fact, this conduct would likely to be considered egregarious enough or/and sufficiently severe as to create a hostile work environment and to alter the terms and conditions of the charging party's employment.

In similar cases the court states that employer's should be liable "if there are no reasonably available avenues, by which victims of harassment can make their complaints known to the appropriate officials, who are in a position to do something about the complaints"

The record shows that the respondent has in place procedures for complaint reporting, related to issues of harassment, discrimination, or unfair treatment at the work place. The policy's guidelines provide employees with various complaint reporting avenues. For example, employees are encouraged to contact the company's Human Resources Specialist; the 24 hour incident reporting hotline, the www.Mysafeworkplace.com, website. The 800 telephone hotline is available 24 hours, 7 days a week. Finally, employees that feel that their concerns have not been addressed by the various avenues provided above, may directly call and file a complaint with the EEOC, or the appropriate agencies.

In order to establish the respondent's direct liability, the initial question should be whether the employer knew, or should have known of the alleged harassment. If actual knowledge existed, and if the employer failed to take immediate and appropriate corrective action, the employer would be directly liable. More commonly an employer acquires actual knowledge thorough first-hand observation, by the victim's internal complaint to other supervisors, or managers; or by a charge of discrimination.

The evidence on record shows that prior to his discharge, charging party, did not put the respondent on notice of the harassing comments based on his race. In fact, the record shows that after the alleged comments were made, charging party contacted the respondent's "My safe workplace" web hotline, at least once to report incidents of disparate treatment, but never reported the harassing comments.

Furthermore, subsequent to his discharge, charging party, contacted the respondent's web hotline, on three (3) different occasions, (on May 30, June 4; and June 10, 2008) to report additional incidents of disparate treatment and retaliation. In the calls he provided a detailed record of incidents of disparate treatment, but he never brought up the derogatory racial comments or harassing conduct. Additionally, during the intake of his complaint to the EEOC on June 5, 2008, during his rebuttal interview on August 2008, and during the unemployment hearing on December 23, 2008, charging party again failed to report the disparaging comments. Had the charging party reported the blatantly discriminatory comments made by supervisors, before his discharge and had the respondent not taken prompt remedial action, then they would certainly and irrefutably have been liable for their actions.

Therefore, considering the totality of the circumstances in this case, it is reasonable to conclude that there is insufficient evidence to establish that prior to charging party's discharge, the respondent knew or should have known of the unlawful harassment by supervisors on the basis of his race and/or national origin and failed to take prompt remedial actions

In a case alleging retaliation, the following needs to be established

1. That the charging party engaged in an activity protected under Title VII and Chapter 11A.
2. That he was subjected to an adverse employment action; and
3. That there was a causal connection between the participation in the protected activity and the adverse employment action.

The charging party maintains that the reason for his discharge was because he reported the discriminatory treatment that he had been subjected to, by his supervisors, White Hispanic.

The record shows that the charging party has followed the company's procedures in reporting complaints. In fact, the record shows that he reported to management and to the respondent's "my safe workplace" that his requests for assistance to do his work went unanswered by his supervisors, that he was assigned less desirable jobs than is Hispanic counterparts, that he was assigned to do work in areas inaccessible due to City ordinances, that he had been assigned to Spanish speaking areas, even though he did not speak Spanish, that his jobs were assigned to Hispanics, that he was assigned minor jobs that did not pay much, and which were rejected by Cuban employees.

The evidence on record indicates that there is a causal connection between the participation in a protected activity and his subsequent termination. In fact, the investigation reveals that charging party was terminated after he reported the alleged discriminatory treatment. Moreover, his dismissal was contemporaneous with his complaints, as it took place only 2 weeks after his report to the company's "my safe work place" website.

Once the charging party had made a prima facie case of retaliation, the burden shifts to the respondent to articulate a legitimate, non-discriminatory reason for their action. The respondent

does not have to prove absence of a retaliatory motive, but must produce evidence that would dispel the inference of retaliation by establishing the existence of a legitimate reason.

The respondent's contention is that the charging party had voluntarily resigned, not once but twice, first, when he did not call or show-up for three consecutive days; and again while he was retrieving his tools from the van he had been assigned to work with, he told his supervisor that he was resigning because he was "not going to pay for the customer complaint." However, the only information that the respondent provided this Commission in support of their defense is statements from charging party's supervisors, stating that on June 4, 2008, the charging party told them that he was resigning to his position. If in fact charging party was discharged indisputably for cause because he allegedly, failed to notify his supervisors for three consecutive work days, then what was the respondent's need of providing supervisors' statements? What is clear, is that in his statement Weitzman also noted that charging party was retrieving his tools from the company's van because he had instructed him to do so the day prior, which is consistent with charging party's allegation that this incident took place only after Nunez had discharged him.

The information on file appears to suggest the reason provided by the respondent for the charging party's discharge was a pretext for unlawful retaliation. The respondent's argument with regard to the reason for the charging party's termination is inconsistent with the records. Respondent contends that the charging party was terminated because he was a no call/no show for 3 consecutive days, in violation of their Attendance and call-in policies and his last reported working day was on May 23, 2008. According to the Termination Report form, he resigned his position on June 4, 2008. Additionally, charging party collected unemployment benefits that otherwise he would not be have been entitled to, if he were discharged.

The detail and consistency of the charging party's testimony, transcripts of his calls to "my safe work place" website along with the corroborative evidence from witnesses with regard to the retaliation charge, appear to substantiate the charging party's claim that he was subjected to retaliation. Therefore, considering the totality of the circumstances in this case, there is sufficient evidence to suggest that the respondent's given reason for his discharge was a pretext and that the charging party was unlawfully discharged.

The evidence contained in the records fails to articulate a valid defense to the charging party's allegations of retaliation. Therefore, it is determined that there is probable cause to believe an unlawful employment practice occurred. Based on the foregoing recommended order of probable cause, the following is recommended

## Recommendations

1. That the charging party be reinstated to the same position he has held prior to his termination, without any loss of seniority and other benefits.

2. That the charging party be paid mitigated back wages from the time of the adverse employment action to the resolution of this matter.

3. That the charging party, be paid 6.5 % on lost wages in accordance with Section 5503(1), Florida Statues.



4. That the charging party be reimbursed for reasonable attorney's fees and costs incurred as a result of bringing this action.

5. That the respondent posts Title VII, Chapter 11A and their antidiscrimination/Retaliation policies, in a visible place, accessible to all employees, within 30 days of this determination.

6. That the company's principals and their staff attend training, in Title VII of the Civil Rights Act of 1964, as amended and Chapter 11A of the Miami-Dade County, Code, as amended, related to antidiscrimination/Retaliation Laws and to send notification to the Commission on Human Rights to the attention of Azucena M. Dilley, investigator, within 30 days of this determination.

7. It will be understood that the MDCCHR would monitor the respondents compliance and enforcement of recommendation of items #4, 5 and 6.

## ORDERS

Either party has the right to request an appeal of the findings and recommendations of the Miami-Dade County Commission on Human Rights (MDCHR) and a hearing on such appeal shall be granted. If no appeal is requested and received by the CHR within fifteen (15) days from receipt of these findings and recommendations of the Director, the recommendations shall become final orders. A request for appeal must be made in person or by certified mail with return receipt. *Appeal requests submitted by facsimile or by a telephone call will not be accepted.* Your request for appeal must include a brief summary of the issues in the investigative report you believe are incorrect findings of fact, and will form the basis of your appeal. The request for appeal should be addressed to: Director, Miami-Dade County Commission on Human Rights, 111 N.W. 1 Street, Suite 2220, Miami, Fl. 33128.

Dated this 11 day of January 2011

Lucia Davis-Raiford
Director
Miami-Dade County Commission on Human Rights